UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X

**09 CIV 6653**

MICHAEL A. JACKSON,

       Plaintiff,

v.

360 BROOKLYN INVESTORS LLC,
and LAMPIASI & ASSOCIATES, LLP,

       Defendants.

----------------------------------------------------X

COMPLAINT

File No.



Plaintiff, Michael A. Jackson ("Jackson" or "Plaintiff"), by his attorney, Law

Office of Seth S. Weitz, for his Complaint against defendant 360 Brooklyn Investors

LLC ("Defendant"), and defendant, Lampiasi & AssociateS ("Lampiasi"), as escrow

agent, alleges as follows:

## PRELIMINARY STATEMENT

1.    This is a civil action pursuant to the Interstate Land Sales Full Disclosure Act, as

amended, 15 U.S.C. § 1701 et seq., ("ILSFDA" or "The Act"), including without

limitation, 15 U.S.C. §§ 1703, 1709 and 1719 and the regulations promulgated thereto, 24

C.F.R 17001.1, et seq. (1991) ("Regulations") to rescind an agreement to purchase

condominium unit 213 (the "Unit") and cabana unit T-6 (the "Cabana") at 360 Furman

Street, Brooklyn, New York (the "Premises"), within the condominium development

known as One Brooklyn Bridge Park Condominium (the "Condominium"), and to

recover all purchase deposits tendered to Defendant.

## THE PARTIES

2.    Jackson maintains an address at 555 West 59th Street, Apt. 29C, New York, NY

10019.

3.     Upon information and belief, Defendant maintains an office at c/o Spandrel Property Services Inc., 86 Chambers Street, Suite 704, New York, NY 10007.

4.     Upon information and belief, at all times relevant hereto, Lampiasi was a New Jersey Limited Liability Partnership, with a place of business at 86 Chambers Street, New York, NY 10007. Lampiasi is sued herein only as the escrow agent for Defendant.

## SUBJECT MATTER JURISTICTION

5.     This Court has subject matter jurisdiction pursuant to 28 USC § 1331, as Jackson's cause of action is a question of federal law arising under ILSFDA, 15 U.S.C. §§1701, et seq.

## VENUE

6.     Venue is proper in this district pursuant to 28 U.S.C. §1391, as upon information and belief, (1) Defendant transacts substantial and continuous business within this district; (2) Defendant offered the contract at issue in this case within this district; (3) the parties executed the contract at issue in this case within this district; (4) the claims alleged in this complaint accrued within this district; and (5) Jackson resides in this District.

## STATEMENT OF FACTS

7.     The Defendant is the developer and sponsor under the condominium offering plan for the Condominium, to be located at the Premises.

8.     The Defendant, in its transaction to sell the Unit in the Condominium to Jackson, employed several instrumentalities of interstate commerce, including the United States Postal Service, electronic means of data and voice communication and non-governmental courier services.

9.     In its ongoing construction of the Condominium, the Defendant, which maintains an office for the transaction of business within this district, purchased goods and services

2

which originated outside the State of New York and were transported to, and incorporated into, the Condominium.

10. On July 27, 2007, Plaintiff and Defendant entered into and executed a purchase agreement (the "Purchase Agreement"), a copy of which is attached hereto as Exhibit "A", to purchase the Unit for $2,250,000.00.

11. Pursuant to the Purchase Agreement, Jackson paid the Defendant a deposit of $225,000.00 (the "Deposit"), which is ten (10%) percent of the Unit's purchase price.

12. On July 27, 2007, Jackson also entered into a cabana rider to the Purchase Agreement (the "Cabana Rider") with Defendant wherein Jackson agreed to purchase the Cabana for $145,000.00. See Exhibit A; page 24-25.

13. Pursuant to the Cabana Rider, Jackson paid Defendant a deposit of $14,500.00, which is 10% of the Cabana's purchase price (the "Cabana Deposit"). (The Purchase Agreement and Cabana Rider are hereinafter collectively referred to as the Purchase Agreement).

14. The Unit and the Cabana were not constructed at the time Jackson and the Defendant executed the Purchase Agreement.

15. The Defendant offered the Condominium for sale as part of a common promotional plan consisting of more than 100 condominium units.

16. The Defendant did not furnish Jackson with the mandatory notices prior to execution of the Purchase Agreement, as required pursuant §1703 of The Act.

17. The Defendant failed to comply with The Act by the Defendant's failure to furnish Jackson with a copy of its registration statement prior to the execution of the Purchase Agreement, as required pursuant to §§ 1704 and 1705 of The Act.

3

18. The Defendant failed to comply with The Act by failing to furnish Jackson with a property report prior to execution of the Purchase Agreement, as required pursuant to § 1703(a)(1)(B) and § 1707 of the Act.

19. The Defendant did not register the Condominium with the Interstate Land Sales Registration Division of the United States Department of Housing and Urban Development, as required pursuant to § 1704 of the Act.

20. More than 180 days have elapsed since Jackson executed the Purchase Agreement, and the Defendant has failed to deliver to him a warranty deed for the Unit and a deed that warrants that the Defendant has not conveyed the Unit to another person and that the Unit is free from encumbrances made by the Defendant or any other person claiming by through or under the Defendant, or any other deed for the Unit.

21. On March 20, 2009, Jackson notified the Defendant in writing that he was exercising his right to revoke and rescind the Purchase Agreement. A copy of this letter is attached hereto as Exhibit "B".

22. Despite timely and proper demand, Defendant has refused to return the Deposit and the Cabana Deposit, plus all accrued interest.

23. Pursuant to the Act, Jackson may revoke the Purchase Agreement within two (2) years of its execution as a result of Defendant's violation of the Act.

24. Upon Defendant's violation of the Act, Jackson is entitled to recover, among other relief, the Deposit and the Cabana Deposit from the Defendant.

4

## AS AND FOR A FIRST CAUSE OF ACTION
### (Violation of the Interstate Land Sales Full Disclosure Act – 15 U.S.C. §1701 et. seq.)

25. Based on the Defendant's failure to comply with the Act, Jackson is not obligated to complete the purchase of the Unit or the Cabana.

26. Jackson, by written notice, timely notified Defendant of his election and demand to revoke and rescind the Purchase Agreement.

27. Defendant failed and refused, and continues to fail and refuse, to honor Jackson's notice of revocation and rescission.

28. Defendant failed and refused and continues to fail and refuse, to refund the Deposit and the Cabana Deposit to Jackson.

29. As a result, Jackson is entitled to, without limitation, revocation and rescission of Purchase Agreement and damages, including, but not limited to, return of the Deposit and the Cabana Deposit, attorney's fees and expenses for this action and costs incurred, and contribution from all who are liable in such manner and to such extent and to such further relief as justice may require.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract)

30. By virtue of Defendant's actions, Defendant has breached the Purchase Agreement.

31. Jackson has been damaged in a sum to be determined by the Court, but in any event, not less than the sum of $239,500.00 plus interest from July 27, 2007, costs, disbursements and reasonable attorney's fees.

## AS AND FOR A THIRD CAUSE OF ACTION

(Rescission of Contract)

32.     Pursuant to the Purchase Agreement, the parties agreed that if the Defendant failed to close title to the Unit with Jackson on or before December 31, 2008, through no fault of Jackson, Jackson had the right to terminate the Purchase Agreement by delivering a rescission notice to Defendant within ten days thereafter.

33.     Defendant was unable to and failed to meet this condition precedent and close title to the Unit with Jackson on or before December 31, 2008, through no fault of Jackson.

34.     By letter dated January 5, 2009, as amended by letter dated January 6, 2009, Jackson timely notified Defendant that he was terminating the Purchase Agreement due to Defendant's inability to close title by the deadline. A copy of the letters are attached hereto collectively as Exhibit "C".

35.     Pursuant to the Purchase Agreement, if Jackson chose to terminate the Purchase Agreement, Defendant was required to return the Deposit and Cabana Deposit.

36.     Defendant failed and refused, and continues to fail and refuse, to honor Jackson's termination notice, despite timely notice.

37.     Defendant failed and refused and continues to fail and refuse, to refund the Deposit and the Cabana Deposit to Jackson, despite timely notice.

38.     Jackson has been damaged in a sum to be determined by the Court, but in any event not less than the sum of $239,500.00, plus interest from December 31, 2008.

6

## PRAYER FOR RELIEF

Plaintiff Michael A. Jackson prays for judgment and declaration against the
defendants 360 Brooklyn Investors LLC and Lampiasi & Associates LLP, as follows:

(1)     finding that the Purchase Agreement is not exempt from ILSFDA, and
        Defendant was in violation therof by entering into the aforesaid agreement
        with Jackson;

(2)     rescinding, revoking and terminating the Purchase Agreement and
        directing Lampiasi to return the deposit monies of $239,500.00, plus
        accrued interest thereon;

(3)     awarding Jackson his compensatory damages;

(4)     awarding reasonable attorney's fees pursuant to §1709(c) of ILSFDA;

(5)     awarding  Jackson his court costs;

(6)     awarding Jackson prejudgment and post judgment interest;

(7)     awarding Jackson any other damages allowable by any applicable statute;
        and

(8)     allowing Jackson to recover such further relief to which he may be
        entitled.

LAW OFFICE OF SETH S. WEITZ
Attorney for Plaintiff

By: _____

Seth S. Weitz
747 Third Avenue, 4ᵗʰ Floor
New York, NY 10017
(212) 980-9595

Dated: July 24, 2009
       New York, New York

7

# PURCHASE AGREEMENT

## 360 Brooklyn Investors, LLC

Sponsor

### With

Michael A. Jackson

Purchaser

### Apartment Unit Number 213

## ONE BROOKLYN BRIDGE PARK CONDOMINIUM
### 360 FURMAN STREET
### BROOKLYN, NEW YORK 11201

# TABLE OF CONTENTS

**Section**                                                                                                  **Page**

1.   THE PLAN ................................................................................................................. 1
2.   DEFINITIONS............................................................................................................ 1
3.   THE UNIT.................................................................................................................. 2
4.   PURCHASE PRICE .................................................................................................... 2
5.   DEPOSIT TO BE HELD IN TRUST .......................................................................... 3
6.   CLOSING DATE AND PLACE ................................................................................... 3
7.   CLOSING DOCUMENTS ........................................................................................... 3
8.   STATUS OF TITLE .................................................................................................... 4
9.   CLOSING ADJUSTMENTS ........................................................................................ 4
10.  MORTGAGE TAX CREDIT ....................................................................................... 5
11.  CLOSING COSTS....................................................................................................... 6
12.  AGREEMENT NOT A LIEN OR ENCUMBRANCE.................................................... 6
13.  DEFAULT BY PURCHASER ...................................................................................... 6
14.  AGREEMENT SUBJECT TO PLAN BEING EFFECTIVE ......................................... 7
15.  SPONSOR'S INABILITY TO CONVEY THE UNIT.................................................... 7
16.  FIXTURES, APPLIANCES AND PERSONAL PROPERTY.......................................... 8
17.  SUBSTANTIAL RENOVATION ................................................................................. 8
18.  INSPECTION OF THE UNIT ...................................................................................... 8
19.  DAMAGE TO THE UNIT ........................................................................................... 9
20.  NO REPRESENTATIONS........................................................................................... 9
21.  PROHIBITION AGAINST ADVERTISING................................................................. 10
22.  BROKER .................................................................................................................... 10
23.  AGREEMENT MAY NOT BE ASSIGNED.................................................................. 10
24.  BINDING EFFECT ..................................................................................................... 10
25.  NOTICES.................................................................................................................... 11
26.  JOINT PURCHASERS................................................................................................ 11
27.  LIABILITY OF SPONSOR.......................................................................................... 11
28.  FURTHER ASSURANCES .......................................................................................... 11
29.  AGREEMENT NOT CONTINGENT UPON FINANCING ........................................... 12
30.  COSTS OF ENFORCING AND DEFENDING AGREEMENT ...................................... 12
31.  SEVERABILITY ......................................................................................................... 12
32.  STRICT COMPLIANCE.............................................................................................. 12
33.  GOVERNING LAW ..................................................................................................... 12
34.  WAIVER OF JURY ..................................................................................................... 12
35.  ENTIRE AGREEMENT............................................................................................... 13
36.  CERTAIN REFERENCES ........................................................................................... 13

| | | |
|---|---|---|
| 37. | CAPTIONS | 13 |
| 38. | SUCCESSORS AND ASSIGNS | 13 |
| 39. | CONFIDENTIALITY | 13 |
| 40. | NO ORAL CHANGES | 13 |
| 41. | PERFORMANCE | 13 |
| 42. | COUNTERPARTS | 14 |
| 43. | WAIVER OF DIPLOMATIC OR SOVEREIGN IMMUNITY | 14 |
| 44. | LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS DISCLOSURE | 14 |

SCHEDULE A – PERMITTED ENCUMBRANCES

SCHEDULE B – INSPECTION STATEMENT

SCHEDULE C – DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT AND/OR
LEAD-BASED PAINT HAZARDS

### PURCHASE AGREEMENT

### APARTMENT UNIT NUMBER 213

### ONE BROOKLYN BRIDGE PARK CONDOMINIUM
### 360 FURMAN STREET
### BROOKLYN, NEW YORK 11201

AGREEMENT, made as of _July 27_, _2007_, between Sponsor and Purchaser (defined below).

### W I T N E S S E T H :

1. **THE PLAN**

Purchaser acknowledges having received and read a copy of the Offering Plan for the One Brooklyn Bridge Park Condominium and all amendments thereto, if any, filed prior to the date hereof with the Department of Law of the State of New York (hereinafter, collectively, referred to as the "Plan") at least 3 business days prior to Purchaser's signing this Agreement. If Purchaser has not received and read the Plan and all amendments thereto at least 3 business days prior to Purchaser's signing this Agreement, Purchaser shall have the right to rescind this Agreement, by sending written notice of such rescission to Sponsor by certified or registered mail, return receipt requested, or by personal delivery, in either case within 7 days from the date Purchaser delivers an executed Purchase Agreement together with the required Deposit to Selling Agent. The Plan is incorporated herein by reference and made a part hereof with the same force and effect as if set forth at length. In the event of any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan will govern and be binding. Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Declaration, By-laws and Residential Rules and Regulations contained therein) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor.

2. **DEFINITIONS**

Terms used herein which are also used in the Plan shall have the same meanings as they do in the Plan, unless the context requires otherwise.

2.1   "Sponsor" means 360 Brooklyn Investors, LLC, having an office c/o 86 Chambers Street, Suite 704, New York, New York 10007. Sponsor's taxpayer identification number is 20-1218093.

2.2.   "Purchaser" means   Michael A. Jackson
45 W 67th Street, Apt. 23C
New York, NY 10023

Purchaser's social security number is   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

2.3   "Attorney for Sponsor" means Lampiasi & Associates LLP, having an address at 86 Chambers Street, Suite 704, New York, New York 10007; Attention: Jeffrey Lampiasi, Esq. Telephone number: (212) 619-1819 ex. 241.   Facsimile number: (212) 619-1869.   E-mail address: JLampiasi@lampiasilaw.com.

2.4   "Attorney for Purchaser" means   Law Office of Seth S. Weitz
having an address at _____   747 3rd Avenue, 4th Floor_____
New York, NY 10017

Attention: _Seth S. Weitz, Esq._____ , Esq.  Telephone number:
212-980-9595_____ Facsimile number: 212-980-0729_____ .

    2.5   "Selling Agent" means Stribling Marketing Associates LLC, having an address at 924 Madison Avenue, New York, New York 10021. Telephone number: (212) 570-2440. Facsimile number: (212) 570-0318. The Developers Group LLC, having an address at 79 Bridge Street, Brooklyn, New York 11201. Telephone number: (718) 222-1545. Facsimile number: (718) 222-0445. And, Spandrel Property Services, Inc., having an address at 86 Chambers Street, Suite 704, New York, New York 10007. Telephone number: (212) 748-8900. Facsimile number: (212) 748-7950.

    2.6   "Co-Broker" means None

    2.7   "Escrow Agent" means Lampiasi & Associates LLP, having an address at 86 Chambers Street, Suite 704, New York, NY 10007; Attention: Jeffrey M. Lampiasi, Esq. Telephone number: (212) 619-1819 Ext. 241. Facsimile number: (212) 619-1869. Email address: jlampiasi@lampiasilaw.com.

    2.8   "Title Company" means Commonwealth Land Title Insurance Company, having and office at 140 East 45th Street, New York, New York 10017. Telephone number: (212) 949-0100. Facsimile number: (212) 883-6825.

## 1.   THE APARTMENT UNIT

    Upon and subject to the terms and conditions set forth herein, Sponsor agrees to sell and convey, and Purchaser agrees to purchase, the Apartment Unit designated as Apartment Unit 213_____ in the Declaration, together with its undivided 0.28%_____ % interest in the Common Elements appurtenant to such Apartment Unit ("Unit").

## 2.   PURCHASE PRICE

    4.1   The Purchase Price for the Unit ("Purchase Price") is $ 2,250,000.00_____ .

The Purchase Price is payable as follows:

    (a)   $ 225,000.00_____ , ("Deposit"), due upon Purchaser's signing and delivering this Agreement, by check (subject to collection), receipt of which is hereby acknowledged;

    (b)   $ 2,025,000.00_____ ("Balance of Purchase Price"), by good certified check of Purchaser or official bank check, payable on the delivery of the deed as hereinafter provided.

    4.2   All checks shall represent United States currency, be drawn on or issued by a United States Bank or trust company which is a member of the New York Clearing House Association and shall be unendorsed. The Deposit shall be made payable to the direct order of "Lampiasi & Associates LLP, as Escrow Agent." The Balance shall be made payable to the direct order of "360 Brooklyn Investors, LLC"(or such other party as Sponsor directs to Purchaser, in writing, at least 1 business day prior to the date of Closing of Title). If any check is returned for insufficient funds or any other reason, such return shall be deemed to be a default by Purchaser under this Agreement and shall entitle Sponsor to exercise any of the remedies set forth in Article 13 hereof. Notwithstanding the foregoing, if the check representing the Deposit is returned for insufficient funds or any other reason, such return shall be deemed to be a non-curable default by Purchaser and this Agreement shall automatically be deemed cancelled. Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale.

## 5.   DEPOSIT TO BE HELD IN TRUST

All Deposits made pursuant to this Agreement are subject to the requirements of Sections 352-e(2) (b) and 352-h of the New York General Business Law and the Attorney General's regulations promulgated pursuant thereto. All monies received from Purchaser towards the Deposit shall be delivered to Escrow Agent and shall be held in accordance with the Section of the Plan entitled "Escrow and Trust Fund Requirements." By signing this Agreement, Purchaser will not object and will be deemed to have agreed, without the need for a further written agreement, to the release of the Deposit to Sponsor in the event Sponsor and Purchaser close title under this Agreement. If Purchaser shall default on Purchaser's obligations under this Agreement, then the Deposit shall be released to Sponsor as liquidated damages, and thereafter, neither party shall have any further rights or obligations against or to each other. In the event Sponsor cannot convey title to the Unit to Purchaser by reason other than Purchaser's default, the Deposit shall be returned to Purchaser, within 30 business days of Sponsor's notification to Purchaser that it cannot convey title.

## 6.   CLOSING DATE AND PLACE

6.1   The Closing of Title shall be held at the offices of Lampiasi & Associates LLP, 86 Chambers Street, Suite 704, New York, New York 10007 (or such other place in the City and State of New York as Sponsor may designate to Purchaser) and on such date and hour as Sponsor may designate to Purchaser on not less than 30 days' prior written notice ("Initial Closing Notice"). If Sponsor consents to close at any other location as an accommodation to Purchaser, Purchaser shall pay to Attorney for Sponsor at Closing an extra fee as set forth in the Plan. After the Initial Closing Notice, Sponsor may, from time to time, adjourn and reschedule the date and hour for Closing on not less than 5 business days notice to Purchaser, which new closing notice shall fix a new date, hour and place for the Closing of Title and which date shall not be earlier than the date set forth in the Initial Closing Notice. Only the Initial Closing Notice shall require 30 days' prior written notice. These notice provisions may be modified or waived by an agreement signed by Sponsor and Purchaser.

6.2   The term "Closing Date" "Closing" "Closing of Title" or words of similar import, whenever used herein, shall mean the date on which the deed to the Unit is delivered to Purchaser.

6.3   The Closing of Title shall only occur with or after compliance with the prerequisites to Closing and the Section of the Plan entitled "Terms of Sale."

## 7.   CLOSING DOCUMENTS

7.1   At the Closing of Title, Sponsor shall deliver to Purchaser a Unit deed with covenant against grantor's acts conveying a leasehold condominium interest in the Unit to Purchaser. The deed shall be prepared by Sponsor substantially in the form set forth in Part II of the Plan and shall be executed and acknowledged by Sponsor in form for recording. Purchaser shall pay all New York State and New York City real property transfer taxes, and Sponsor and Purchaser shall duly complete and execute before a notary public the New York City and New York State Transfer Tax Return Forms and any other forms then required by Law, all of which shall be prepared by Sponsor.

7.2   At the Closing of Title, Purchaser shall execute and acknowledge a Power of Attorney to the Condominium Board prepared by Sponsor substantially in the form set forth in Part II of the Plan.

7.3   At the Closing of Title, Sponsor shall deliver to Purchaser a certification stating that Sponsor is not a foreign person in compliance with IRS Section 6045(a) as amended, or any successor provision or regulation promulgated thereunder.

7.4   At the Closing of Title, Sponsor and Purchaser shall execute and acknowledge in form for recording such other documents that are reasonably necessary or customary in connection with the

conveyance of a condominium unit, including, but not limited to, title affidavits, transfer tax forms, reporting information in respect of real estate transactions, smoke detector affidavit and window guard notices.

7.5     The executed deed, transfer tax forms and Power of Attorney shall be delivered at the Closing to the representative of the Title Company insuring Purchaser's title (or, if no such representative is present, then to the Attorney for Sponsor) for recording in the Office of the City Register, which recording shall be at Purchaser's expense. After being recorded the deed shall be returned to Purchaser and the Power of Attorney shall be returned to the Condominium Board.

7.6     Purchaser's payment of the Balance of the Purchase Price and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing. However, nothing herein contained shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the Closing, and nothing herein shall be in derogation of the rights of purchasers under Article 23-A of the General Business Law, the Plan, and Part 20 of the Regulations issued by the Department of Law.

## 8.     STATUS OF TITLE

8.1     At the Closing of Title, Sponsor shall convey to Purchaser and Purchaser shall accept such leasehold title to the Unit as the Title Company will approve and insure without additional premium to Purchaser, provided that the only liens and encumbrances affecting title shall be those set forth in Schedule A annexed hereto and made a part hereof and those expressly agreed to by Purchaser. Any lien and encumbrance or condition which is not set forth in Schedule A annexed hereto shall not be an objection to title if (a) the instrument required to remove it of record is delivered at or prior to the Title Company, together with the attendant recording or filing fee, if any, or (b) the Title Company (or such other title insurance company Purchaser may utilize), is or would be willing, in a policy issued by it to Purchaser, to insure Purchaser that it will not be collected out of the Unit if it is a lien, or will not be enforced against the Unit if it is not a lien. Sponsor shall not be obligated to cause Purchaser's title company to omit any exceptions if the Title Company is willing to insure, without additional premium, Purchaser's title with such exception.

8.2     Sponsor shall be entitled to adjourn the Closing to remove or correct any defect in title which is not set forth in Schedule A. However, if such defect existed at least 10 days prior to the Closing and Purchaser, or Purchaser's attorney, failed to send Sponsor's attorney written notice of such defect in title at least 10 days prior to the Closing of Title, then, for purposes of Article 13 below, Purchaser shall be deemed at fault for not having sent timely notice, and the Closing adjournment to allow Sponsor to correct or remove such title defect shall be considered as being at the request of Purchaser.

8.3     If, subsequent to the Closing of Title, Purchaser claims that Sponsor did not convey title to the Unit in accordance with the Plan, Purchaser must first seek recovery against Purchaser's title insurance company before proceeding against Sponsor. Sponsor and Purchaser agree that Sponsor's liability will be limited to any loss or damage not covered by Purchaser's title insurance company. If Purchaser did not obtain title insurance at the Closing, for purposes of this subparagraph, the amount and coverage which Purchaser could have obtained from Purchaser's title insurance company shall be deducted from the loss or damage collectable against Sponsor. Nothing contained in this subparagraph shall be construed to waive any of Purchaser's rights or abrogate any of Sponsor's obligations under the Plan or Article 23-A of the General Business Law.

## 9.     CLOSING ADJUSTMENTS

9.1     The following adjustments shall be made as of midnight of the day preceding the Closing Date with respect to the Unit:

(a)     PILOT and assessments, if any (including water charges and sewer rents, if separately assessed), on the basis of the period for which assessed;

(b)     Common Charges (if Common Charges have been assessed by the Condominium Board) and assessments for the month in which title closes; and

(c)     if Purchaser is allowed to occupy the Unit prior to Closing, accrued rent and any other charges pursuant to a use and occupancy agreement, if any, covering the Unit.

9.2     If the Unit has been separately assessed for purposes of PILOT but the Closing of Title occurs before the PILOT is fixed, adjustment of PILOT shall be based upon the latest rate applied to the most recent applicable assessed valuation. Installments for PILOT due after the Closing, if any, shall be paid by Purchaser and shall not be considered a defect in title. If the Unit has not been separately assessed for PILOT as of the Closing Date for the then current tax period, the adjustment under subsection 9.1(a) hereof shall be based upon the assessment for the Property and the percentage interest in the Common Elements appurtenant to the Unit. In addition, Purchaser shall pay the Unit's proportionate share of PILOT for the next ensuing tax period and Sponsor or the Condominium will pay such PILOT pursuant to the terms of the Lease.

9.3     Purchaser agrees that, if Sponsor obtains a refund for PILOT paid (or a credit for such PILOT to be paid) on Purchaser's Unit, Purchaser and Sponsor will apportion the refund (as well as the costs and/or fees for obtaining the refund or credit) based on the percentage of time for which the refund or credit is obtained during which each party hereto owned the Unit in question. The provisions of this subsection shall survive the Closing of Title.

9.4     Provided Sponsor is ready, willing and able to close title in accordance with this Agreement, if Purchaser fails for any reason to close title to the Unit on the originally scheduled Closing Date (a) the Closing apportionments described in Section 9.1 of this Agreement will be made as of midnight of the day preceding the originally scheduled Closing Date, regardless of when the actual Closing of Title occurs, and (b) Purchaser will be required to pay to Sponsor, as a reimbursement of Sponsor's higher carrying costs for the Unit by virtue of the delay, and in addition to the other payments to be made to Sponsor under this Agreement and the Plan, an amount equal to 0.03% of the Purchase Price for each day starting from (and including) the originally scheduled Closing Date to (and including) the day before the actual Closing Date. If, through no fault of Purchaser, Sponsor postpones the originally scheduled Closing Date, these provisions shall apply to the rescheduled Closing Date if Purchaser fails for any reason to close title to the Unit on the rescheduled Closing Date.

9.5     Adjustments and apportionments shall be calculated on the basis of the actual number of days in the period for which payments were made or are due, as the case may be. The "Customs in Respect of Title Closings" recommended by The Real Estate Board of New York, Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned except as otherwise provided herein in the Plan.

9.6     Any errors or omissions calculating apportionments at Closing shall be corrected and, any payment shall be made to the proper party promptly after discovery. This provision shall survive the Closing of Title.

## 10.     MORTGAGE TAX CREDIT

In the event a mortgage recording tax credit becomes available pursuant to Section 339-ee(2) of the New York Condominium Act, it is specifically understood that such credit shall inure to the benefit of Sponsor. Accordingly, at Closing, a Purchaser who elects mortgage financing will be responsible to pay the full amount (but not in excess thereof) of the mortgage recording tax chargeable on the entire amount being financed. At the Closing of Title, Sponsor will be reimbursed by Purchaser to the extent of any mortgage tax credit allowed.

## 11.   CLOSING COSTS

In addition to those costs and adjustments described in Articles 9 and 10 herein, Purchaser shall be required to pay the other closing costs which are Purchaser's responsibility as more particularly described in the Section of the Plan entitled "Closing Costs and Adjustments." All such Closing Costs shall be paid by Purchaser, at Closing, by Purchaser's unendorsed personal certified check or by official bank check, in either event drawn upon a bank that is a member of the New York Clearing House Association.

## 12.   AGREEMENT NOT A LIEN OR ENCUMBRANCE

No lien or encumbrance shall arise against the Property or the Unit as a result of this Agreement or any monies deposited hereunder, except as hereinafter set forth. In furtherance and not in limitation of the provisions of the preceding sentence, Purchaser agrees that the provisions of this Agreement are and shall be subject and subordinate to the lien of any mortgage heretofore or hereafter made, including, but not limited to, any construction or building loan mortgage, and any advances heretofore or hereafter made thereon and any payments or expenses made or incurred or which hereafter may be made or incurred, pursuant to the terms thereof, or incidental thereto, or to protect the security thereof, to the full extent thereof, without the execution of any further legal documents by Purchaser. This subordination shall apply in all cases, regardless of the timing of, or cause for, the making of advances of money or the incurring of expenses. Sponsor shall, at its option, either satisfy such mortgages or obtain a release of the Unit and its undivided interest in the Common Elements from the lien of such mortgages on or prior to the Closing Date. The existence of any mortgage or mortgages encumbering the Property, or portions thereof, other than the Unit and its undivided interest in the Common Elements, shall not constitute an objection to title or excuse Purchaser from completing payment of the Purchase Price or performing all of Purchaser's other obligations hereunder or be the basis of any claim against, or liability of, Sponsor, provided that any such mortgage(s) is subordinated to the Declaration.

## 13.   DEFAULT BY PURCHASER

13.1   The following shall constitute "Events of Default" hereunder:

(i)   Purchaser's failure to pay the Balance of the Purchase Price, or any closing adjustment or closing cost required to be paid by Purchaser as set forth in the Plan or in this Agreement, or the dishonor of any check given by Purchaser to Sponsor; or

(ii)   Purchaser's failure to pay, perform or observe any of Purchaser's other obligations under this Agreement or the Plan; or

(iii)   if Purchaser is permitted to become the tenant or occupant of the Unit, Purchaser's failure to pay rent or to otherwise comply with some other lease or occupancy obligation; or

(iv)   Purchaser's assignment of any of Purchaser's property for the benefit of creditors, or Purchaser's filing a voluntary petition in bankruptcy; or

(v)   if a non-bankruptcy trustee or receiver is appointed over Purchaser or Purchaser's property, or an involuntary petition in bankruptcy is filed against Purchaser; or

(vi)   if a judgment or tax lien is filed against Purchaser and Purchaser does not pay or bond the judgment or lien; or

(vii)   Purchaser's assignment or transfer of this Agreement without the prior written consent of Sponsor; or

(viii)   Purchaser's listing the Unit for resale or rental with any broker or advertising or otherwise offering, promoting or publicizing the availability of the Unit for sale or rental without Sponsor's prior written consent; or

(ix)   an Event of Default by Purchaser beyond any applicable grace period under a Purchase Agreement between Purchaser and Sponsor for another Unit at the Property.

13.2   **TIME IS OF THE ESSENCE** with respect to Purchaser's obligations to pay the Balance of the Purchase Price and to pay, perform or comply with Purchaser's other obligations under this Agreement. Upon the occurrence of an Event of Default, Sponsor, in its sole discretion, may elect by notice to Purchaser to: (i) cancel this Agreement, or (ii) seek specific performance. If Sponsor elects to cancel, Purchaser shall have 30 days from the giving of the notice of cancellation to cure the specified default. If the default is not cured within such 30 days, TIME BEING OF THE ESSENCE, then this Agreement shall be deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, the entire Deposit and any interest earned on the Deposit. Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale. If Sponsor elects to seek specific performance, then Purchaser shall have 30 days from the giving of notice of Sponsor's election to close on the Unit in accordance with this Agreement, without prejudice to Sponsor's right to recover from Purchaser all damages, losses, costs, expenses and all other lawful sums to which Sponsor is entitled (including, but not limited to, reasonable legal fees and costs of collection).

## 14.   AGREEMENT SUBJECT TO PLAN BEING EFFECTIVE

The performance by Sponsor of its obligations under this Agreement is contingent upon the Plan having been declared effective in accordance with the terms and provisions of the Plan. The Plan may be withdrawn or abandoned by Sponsor only under certain conditions and at certain times, as set forth in the Plan. If the Plan is abandoned or if, after being declared effective, the Plan is not consummated for any reason and Purchaser is not in default under this Agreement beyond any applicable grace period, this Agreement shall be deemed cancelled and the Deposit, together with interest earned thereon, shall be returned to Purchaser. Upon such return, neither party shall have any further rights, obligations or liability to or against the other and the parties shall be released and discharged from all obligations and liability under this Agreement and the Plan.

## 15.   SPONSOR'S INABILITY TO CONVEY THE UNIT

If Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement and the Plan, Sponsor shall not be obligated to bring any action or proceeding or otherwise incur any cost or expense of any nature whatsoever in excess of its obligations set forth in the Plan in order to cure such inability. If Sponsor is not so obligated under the Plan and notifies Purchaser of its election or inability to cure such title defect, and if Purchaser is not in default hereunder, Purchaser's sole remedy shall be to either (a) take title to the Unit subject to such title defect (without any abatement in, or credit against, the Purchase Price, or any claim or right of action against Sponsor for damages or otherwise) or (b) terminate this Agreement. If Purchaser elects to terminate this Agreement, Sponsor shall, within 30 days after receipt of notice of termination from Purchaser, return to Purchaser all sums deposited by Purchaser hereunder, together with interest earned thereon, if any. Upon making such payment, this Agreement shall be terminated and neither party hereto shall have any further rights, obligations or liability to or against the other under this Agreement or the Plan. The foregoing remedy must be exercised by notice of Purchaser in writing to Sponsor within 15 days after the giving of Sponsor's notice of election not to cure such inability, failing which it shall be conclusively deemed that Purchaser elected the remedy described in clause (a) above (i.e., to acquire title subject to such inability).

16.  **FIXTURES, APPLIANCES AND PERSONAL PROPERTY**

Only those fixtures, appliances and items of personal property which are described in the Plan as being included in the Unit are included in this sale. No portion of the Purchase Price shall be attributable to such items.

17.  **SUBSTANTIAL RENOVATION**

17.1  The Substantial Renovation of the Building and the Unit, including the materials, equipment and fixtures to be installed therein, shall be substantially in accordance with the Plan and the Plans and Specifications, subject to the right of Sponsor to amend the Plan and the Plans and Specification in order to substitute materials, equipment or fixtures of equal or better quality, provided that the approval of any governmental authorities having jurisdiction is first obtained (if required). The issuance of a Permanent Certificate of Occupancy for the Building shall be deemed presumptive evidence that the Building and the Unit have been fully completed in accordance with the Plan and the Plans and Specifications. However, nothing herein contained shall excuse Sponsor from its obligation to correct any defects in construction in accordance with the conditions set forth in the Section of the Plan entitled "Rights and Obligations of Sponsor."

17.2  The Substantial Renovation of the Building and the Unit and the correction of any defects in the construction thereof to the extent required under the Plan are the sole responsibility of Sponsor. Purchaser acknowledges and agrees that Sponsor will not be liable for, and will have no obligation to correct, certain variations from the Plan and Plans and Specifications as indicated in the Section of the Plan entitled "Rights and Obligations of Sponsor" and will only be responsible to correct any construction defects to the extent, and on the terms and conditions, set forth in such Section.

17.3  The closing of title shall occur only after, or concurrently with, compliance with the prerequisites set forth under "Closing of Title to Units" in Part I of the Plan. As a result, if all such prerequisites are met, Purchaser shall be obligated to close and complete payment of the full Purchase Price (without provision for escrow), notwithstanding any construction items noted on Purchaser's Inspection Statement (as hereinafter defined) remaining for Sponsor to complete and/or correct in accordance with its obligation under the Plan, and notwithstanding the incomplete construction and/or decoration of any other portions of the Building or the Unit.

17.4  The actual date for the First Closing is not guaranteed or warranted, and may be earlier or later depending on the progress of construction and compliance with the other prerequisites recited in the Section of the Plan entitled "Closing of Title to Residential Units." Purchaser acknowledges that construction may be delayed by late delivery of material or equipment, labor difficulties, unavailability of Building trades, casualty, inclement weather and other events beyond Sponsor's reasonable control. Purchaser further acknowledges that the Units in the Building will be completed at varying times over a period that could extend well beyond the First Closing. The order in which these Units will be completed is in the discretion of Sponsor. Purchaser acknowledges that except as otherwise provided in the Plan, Purchaser shall not be excused from paying the full Purchase Price, without credit or set-off, and shall have no claim against Sponsor for damages or losses, in the event that the First Closing occurs substantially later than the projected date or the time to complete or to close title to the Unit is delayed or is postponed by Sponsor.

18.  **INSPECTION OF THE UNIT**

18.1  Upon receipt of the Initial Closing Notice, Purchaser shall arrange an appointment with a representative of Sponsor to inspect the Unit within the 7 days prior to the Closing Date. Purchaser or Purchaser's duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Statement (in the form set forth as Schedule B to this Agreement) and deliver same to Sponsor's representative at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or

to inspect the Unit within 7 days prior to the Closing Date or to so sign and deliver the completed Inspection Statement shall not excuse Purchaser from paying the Balance of the Purchase Price when due and shall constitute Purchaser's full acceptance of the Unit as is. However, nothing herein shall relieve Sponsor of its obligations as set forth in the Section of the Plan entitled "Rights and Obligations of Sponsor."

      18.2    Any work set forth on the Inspection Statement may be completed by Sponsor in a reasonable period of time following the Closing and shall not be grounds for delaying the Closing. Purchaser will be required to provide Sponsor with reasonable access to the Unit subsequent to the Closing in order to complete punchlist work. Sponsor has no obligation under the Plan to deposit any monies in escrow at Closing as a result of any punchlist items.

## 19.    DAMAGE TO THE UNIT

      If between the date of this Agreement and the Closing of Title the Unit is damaged by fire or other casualty, the following shall apply:

      19.1    The risk of loss to the Unit by fire or other casualty until the earlier of Closing of Title or possession of the Unit by Purchaser is assumed by Sponsor; provided that Sponsor shall have no obligation or liability to repair or restore the Unit. If Sponsor elects to repair or restore the Unit (which election shall be in its sole discretion and made within 60 days of the damage to the Unit), this Agreement shall continue in full force and effect. Purchaser shall not have the right to reject title or receive a credit against, or abatement in, the Purchase Price and Sponsor shall be entitled to a reasonable period of time within which to complete the repair or restoration. Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss shall, subject to the rights of the Condominium Board and other Unit Owners if the Declaration has theretofore been recorded, belong entirely to Sponsor and, if such proceeds are paid to Purchaser, Purchaser shall promptly upon receipt thereof turn them over to Sponsor. The provisions of the preceding sentence shall survive the Closing of Title.

      19.2    In the event Sponsor notifies Purchaser that it does not elect to repair or restore the Unit (which election shall be made within 60 days of the damage to the Unit), or, if the Declaration has been recorded prior thereto, the Unit Owners do not resolve to make such repairs or restoration pursuant to the By-laws, this Agreement shall be deemed cancelled and of no further force and effect and Sponsor shall return to Purchaser all Deposits and other sums deposited by Purchaser hereunder, together with interest earned thereon, if any, and neither party hereto shall have any further rights, obligations or liability to or against the other hereunder or under the Plan, except that if Purchaser is then in default hereunder (beyond any applicable grace period), Sponsor shall retain all Deposits and other such sums deposited by Purchaser hereunder, together with any interest earned thereon, as and for liquidated damages.

## 20.    NO REPRESENTATIONS

      Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or otherwise, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners, the estimated Common Charges allocable to the Unit, the estimated Proportionate Rent and PILOT on the Unit, the right to any income tax deduction for any PILOT or mortgage interest paid by Purchaser, the right to any income tax credit with respect to the purchase of the Unit, or any other data, except as herein or in the Plan specifically represented. Purchaser has relied solely on Purchaser's own judgment and investigation in deciding to enter into this Agreement and purchase the Unit. No person has been authorized to make any representations on behalf of Sponsor except as herein or in the Plan specifically set forth. No oral representations or statements shall be considered a part of this Agreement. Sponsor makes no representation or warranty as to the work, materials, appliances, equipment or fixtures in

and at any time thereafter, Purchaser agrees upon request to provide Sponsor with written information about Purchaser's employment, financial and rental/ownership history.   Such information obtained prior to countersignature may be used to determine Purchaser's qualification to purchase and own the Unit, but does not constitute a reservation or binding obligation on either the applicant or Sponsor. Sponsor has the right, without incurring any liability, to reject this Agreement without cause or explanation to Purchaser.  This Agreement may not be rejected due to Purchaser's sex, race, creed, color, national origin, ancestry, disability, marital status, or other ground proscribed by Law.

## 25.    NOTICES

25.1    Any notice, election, demand, request, letter, consent or other communication hereunder or under the Plan shall be in writing and either delivered in person or sent, postage prepaid, by registered or certified mail return receipt requested or by Federal Express or other reputable overnight courier, with receipt confirmed to the Attorney for Purchaser at the address given at the beginning of this Agreement with a copy to the Purchaser at the address given at the beginning of this Agreement, and to the Attorney for Sponsor at the address given at the beginning of this Agreement, with a copy to Sponsor at the address given at the beginning of this Agreement by regular mail.  Either party may hereafter designate to the other in writing a change in the address to which notices are to be sent.  Except as otherwise expressly provided herein, a notice shall be deemed given when personal delivery or delivery by overnight courier is effected, or in the case of mailing, the 3 business days after the date of mailing, except that the date of actual receipt shall be deemed to be the date of the giving of any notice of change of address.  Any notice either of the parties hereto receives from the other party's attorneys shall be deemed to be notice from such party itself.

25.2    Sponsor hereby designates and empowers both Selling Agent and Attorney for Sponsor, as Sponsor's agents to give any notice to Purchaser under this Agreement (including, without limitation, a notice of default) in Sponsor's name, which notice so given shall have the same force and effect as if given by Sponsor itself.

25.3    Purchaser hereby designates and empowers the Attorney for Purchaser, as Purchaser's agent to give any notice to Sponsor under this Agreement in Purchaser's name, which notice so given shall have the same force and effect as if given by Purchaser.

## 26.    JOINT PURCHASERS

The term "Purchaser" shall be read as "Purchasers" if more than one person are Purchasers, in which case their obligations shall be joint and several.

## 27.    LIABILITY OF SPONSOR

Sponsor shall be excused from performing any obligation or undertaking provided for in this Agreement for so long as such performance is prevented, delayed or hindered by an act of God, fire, flood, explosion, war, riot, sabotage, inability to procure or general shortage of energy, labor, equipment, facilities, materials or supplies in the open market, failure of transportation, strike, lockout, action of labor unions, or any other cause (whether similar or dissimilar to the foregoing) not within the reasonable control of Sponsor. Sponsor's time to perform such obligations or undertaking shall be tolled for the length of the period during which such performance was excused.

## 28.    FURTHER ASSURANCES

Either party shall execute, acknowledge and deliver to the other party such instruments, and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Agreement or of any transaction

contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

## 29.   AGREEMENT NOT CONTINGENT UPON FINANCING

The terms and provisions of this Agreement and Purchaser's obligations hereunder are not contingent upon Purchaser securing financing of the Purchase Price (or any portion thereof), and Purchaser understands and agrees that Purchaser's failure to obtain such financing will not relieve Purchaser of Purchaser's obligations hereunder. Purchaser further understands and agrees that if Purchaser chooses to finance the purchase of the Unit through a lending institution and obtain a commitment therefrom, neither a subsequent change in the terms of such commitment, the expiration or other termination of such commitment, nor any change in Purchaser's financial status or condition shall release or relieve Purchaser of Purchaser's obligations pursuant to this Agreement and Sponsor shall have no liability as a result of any scheduling or adjournment of the Closing beyond the expiration of the loan commitment.

## 30.   COSTS OF ENFORCING AND DEFENDING AGREEMENT

Purchaser shall be obligated to reimburse Sponsor for any legal fees and disbursements incurred by Sponsor in defending Sponsor's rights under this Agreement or, in the event Purchaser defaults under this Agreement beyond any applicable grace period, in canceling this Agreement or otherwise enforcing Purchaser's obligations hereunder.

## 31.   SEVERABILITY

If any provision of this Agreement or the Plan is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement or the Plan and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Agreement or the Plan, except as otherwise herein or therein provided, shall be valid and enforced to the fullest extent permitted by law.

## 32.   STRICT COMPLIANCE

Any failure by either party to insist upon the strict performance by the other of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, and each party, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by the other party of any and all of the provisions of this Agreement to be performed by such party.

## 33.   GOVERNING LAW

The provisions of this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed wholly in the State of New York, without regard to principles of conflicts of law.

## 34.   WAIVER OF JURY

Except as prohibited by law, the parties shall, and they hereby do, expressly waive trial by jury in any litigation arising out of, or connected with, or relating to, this Agreement or the relationship created hereby or in the Plan. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

### 35.   ENTIRE AGREEMENT

This Agreement, together with the Plan, supersedes any and all understandings and agreements between the parties and constitutes the entire agreement between them with respect to the subject matter hereof.

### 36.   CERTAIN REFERENCES

A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires. The terms "herein," "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and not to the particular provision in which the term is used, unless the context otherwise requires. Unless otherwise stated, all references herein to Articles, Sections, subsections or other provisions are references to Articles, Sections, subsections or other provisions of this Agreement.

### 37.   CAPTIONS

The captions in this Agreement are for convenience of reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

### 38.   SUCCESSORS AND ASSIGNS

The provisions of this Agreement shall bind and enure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and enure to the benefit of Sponsor and its successors and assigns.

### 39.   CONFIDENTIALITY

Sponsor and Purchaser hereby acknowledge and agree to keep all of the terms and conditions of this Agreement confidential. Sponsor and Purchaser agree that any information which is required to be disclosed to the parties respective lawyers, architects/engineers, accountants, individuals who "need to know" or governmental agencies shall not be deemed to be a breach by Sponsor or Purchaser of the parties undertaking of confidentiality contained in this Agreement. Any failure by Purchaser to keep the terms and conditions of this Agreement confidential shall be a default by Purchaser, entitling Sponsor to the default remedies set forth in this Agreement.

### 40.   NO ORAL CHANGES

This Agreement cannot be changed or terminated orally. Any changes or additional provisions must be set forth in a rider attached hereto or in a separate written agreement signed by the parties hereto or by an amendment to the plan.

### 41.   PERFORMANCE

Where this Agreement by its terms requires the payment of money or the performance of a condition on a Saturday, Sunday or public holiday, such payment may be made or condition performed on the next business day succeeding such Saturday, Sunday or such public holiday, with the same force and effect as if made or performed in accordance with the terms of this Agreement.

42.    COUNTERPARTS

This Agreement may be executed in any number of counterparts. Each such counterpart shall for all purposes be deemed an original. All such counterparts shall together constitute but one and the same Agreement.

43.    WAIVER OF DIPLOMATIC OR SOVEREIGN IMMUNITY.

43.1    The provisions of this Article shall survive the Closing of Title or the termination of this Agreement for the purpose of any suit, action, or proceeding arising directly or indirectly, out of or relating to this Agreement.

43.2    If Purchaser is a foreign government, a resident representative of a foreign government or such other person or entity otherwise entitled to diplomatic or sovereign immunity, Purchaser hereby designates a duly authorized and lawful agent to receive process for and on behalf of Purchaser in any state or Federal suit, action or proceeding in the State of New York based on, arising out of or connected with this Agreement or the Condominium Documents.

43.3    If Purchaser is a foreign mission, as such term is defined under the Foreign Missions Act, 22 U.S.C. Section 4305, Purchaser shall notify the United States Department of State prior to purchasing a Unit and provide a copy of such notice to Sponsor. Sponsor shall not be bound under this Agreement unless and until the earlier to occur of: (i) a notification of approval is received from the Department of State; or (ii) sixty (60) days after Purchaser's notice is received by the Department of State.

44.    LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS DISCLOSURE

44.1    The Environmental Protection Agency and the Department of Housing and Urban Development promulgated Federal regulations under 24 CFR Part 35 and 40 CFR Part 745 ("Federal Regulations") regarding the disclosure of lead-based paint and/or lead-based paint hazards to prospective purchasers of apartments. In accordance with the provisions of the Federal Regulations, annexed to this Purchase Agreement as Schedule C is a "Lead Warning Statement" and "Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards" to be signed by Sponsor and Purchaser. Set forth in Part II of the Plan is a pamphlet entitled "Protecting Your Family from Lead in Your Home."

44.2    In the event Purchaser exercises Purchasers' right to conduct a risk assessment or inspection ("Inspection") for the presence of lead-based paint and/or lead-based paint hazards, such Inspection shall be performed within 10 calendar days following the date of this Agreement on the following terms and conditions:

44.2.1    Purchaser and Purchasers' consultant ("Consultant") will be given reasonable access to the Unit and the public areas of the Building.

44.2.2    The Inspection shall be held at a mutually convenient time and date on a business day between 9 a.m. and 5 p.m.

44.2.3    The Inspection shall be performed in a reasonable manner so as not to disturb or interfere with the use, operation, security or occupancy of the Unit or the Building.

44.2.4    Purchaser shall be liable for any damages to the Unit or the Building, injuries, and all claims and lawsuits caused by Purchaser or the Consultant during the Inspection.

44.2.5    Purchaser or the Consultant will not probe, penetrate or disturb any painted or covered surface during the Inspection without Sponsor's approval.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

PURCHASER(S):

Michael A. Jackson

_____

SPONSOR:

360 BROOKLYN INVESTORS, LLC
    a Delaware limited liability company

    By:  360 Furman Associates L.P.,
         its sole member

         By:  360 Conversion Associates LLC,
            its general partner

            By: _____
               Name: Robert A. Levine
               Title:  Manager

## SCHEDULE A

### PERMITTED ENCUMBRANCES

1. Building restrictions and zoning and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted.

2. Any state of facts which an accurate survey or personal inspection of the Property would show, provided such state of facts would not prevent the use of the Unit for dwelling purposes.

3. The terms, burdens, covenants, restrictions, conditions, easements and Residential Rules and Regulations, all as set forth in the Declaration, the By-laws (and the Residential Rules and Regulations made thereunder), the Power of Attorney from the Purchaser to the Condominium Board, and the Floor Plans as all of the same may be amended from time to time.

4. Consents by Sponsor or any former owner of the Land for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

5. Any easement or right of use in favor of any utility company for construction, use, maintenance or repair of utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles and other equipment and facilities on, under and across the Property.

6. Revocability of licenses for vault space, if any, under the sidewalks and streets.

7. Any easement or right of use required by Sponsor or its designee to obtain a temporary, permanent or amended Certificate of Occupancy for the Building or any part of same.

8. Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the Property, and the rights of governmental authorities to require the removal of any such projections and variations.

9. Leases and service, maintenance, employment, and concessions, if any, of other Units or portions of the Common Elements.

10. The lien of any unpaid Common Charges, PILOT, water charge or sewer rent, or vault charge, provided the same are adjusted at the Closing of Title.

11. The lien of any unpaid assessment payable in installments (other than assessments levied by the Condominium Board), except that Sponsor shall pay all such assessments due prior to the Closing Date (with the then current installment to be apportioned as of the Closing Date) and the Purchaser shall pay all assessments due from and after the Closing Date.

12. Any declaration or other instrument affecting the Property which Sponsor deems necessary or appropriate to comply with any law, ordinance, regulation, zoning resolution or requirement of the Department of Buildings, the City Planning Commission, the Board of Standards and Appeals, or any other public authority, applicable to the demolition, construction, alteration, repair or restoration of the Building.

13. Any encumbrance as to which the Title Company (or such other New York Board of Title Underwriters member title insurance company which insures the Purchaser's title to the Unit) would be willing, in a fee policy issued by it to the Purchaser, to insure the Purchaser that such encumbrance (a) will not be collected out of the Unit if it is a lien or (b) will not be enforced against the Unit if it is not a lien.

14. Any other encumbrance, covenant, easement, agreement, or restriction against the Property other than a mortgage or other lien for the payment of money, which does not prevent the use of the Unit for dwelling purposes.

15. Any lease covering the Unit(s) made from Sponsor to the Purchaser.

16. Any violation against the Property (other than the Unit) which is the obligation of the Condominium Board, or another Unit Owner to correct.

17. Standard printed exceptions contained in the form of fee title insurance policy then issued by the Title Company.

18. Any Temporary or Permanent Certificate of Occupancy for the Building, so long as the same permits, or does not prohibit, use of the Unit for its stated purposes.

19. Any encumbrance, covenant, easement, agreement, or restriction against the Property set forth in the form of Unit Owner's Specimen Title Policy prepared by the Title Company set forth in Part II of the Plan, as the same may be updated from time to time prior to the Closing.

20. Terms, covenants, conditions, provisions and agreements in Lease dated as of _____ between Brooklyn Bridge Park Development Corporation ("BBPDC"), as landlord, and Sponsor, as tenant, a memorandum of which was recorded on _____ as CRFN #_____, as same may be amended, modified and/or supplemented from time-to-time.

21. Terms, covenants, conditions, provisions and agreements in the Non-Exclusive Easement Agreement dated as of _____ between Brooklyn Bridge Park Development Corporation ("BBPDC"), as Grantor, and Sponsor, as Grantee, which was recorded on _____ as CRFN #_____, as same may be amended, modified and/or supplemented from time-to-time.

## SCHEDULE B

## INSPECTION STATEMENT

Date: _____

360 Brooklyn Investors, LLC
86 Chambers Street, Suite 704
New York, New York 10007

Re:   Apartment Unit No: _____ ("Unit")
One Brooklyn Bridge Park Condominium
360 Furman Street
Brooklyn, New York 11201 ("Condominium")

Ladies and Gentlemen:

1.   On the date hereof, the undersigned purchaser(s) ("Purchaser") inspected the Unit which Purchaser is acquiring from Sponsor and have found the Unit to be in good condition, except as otherwise noted below.

2.   Purchaser acknowledges that to prevent pilferage, certain items such as medicine cabinet doors, shower heads, toilet seats, kitchen cabinets, vanity knobs and mechanical chimes will be installed just prior to the date Purchaser moves into the Building. Purchaser agrees to sign-off each item requiring adjustment, or repairs, if any, as they are completed.

3.   In the event Purchaser performs work in the Unit of any kind affecting any of the areas or items listed above after the Closing, Sponsor will be relieved of any and all obligations related to the items listed herein.

PURCHASER(S):

SAMPLE ONLY - DO NOT EXECUTE
(signature)

SAMPLE ONLY - DO NOT EXECUTE
(signature)

_____
Sponsor's Representative

## SCHEDULE C

## DISCLOSURE OF INFORMATION ON
## LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS

### LEAD WARNING STATEMENT

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide buyer with information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

### SPONSOR'S DISCLOSURE

(a) Presence of lead-based paint and/or lead-based paint hazards. (check (i) or (ii) below):

   (i) _X_   Known lead-based paint and/or lead-based paint hazards are present in the housing (explain on attached sheet). See "Description of Property and Improvements" set forth in Part II of the Offering Plan.

   (ii) ___   Sponsor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to Sponsor (check (i) or (ii) below):

   (i) ___   Sponsor has provided Purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below on attached sheet).

   (ii) _X_   Sponsor has no records or reports pertaining to lead-based paint and/or lead-based paint hazards in the housing.

### PURCHASER'S ACKNOWLEDGMENT (initial)

(c)    Purchaser has received copies of all information listed above.

(d)    Purchaser has received the pamphlet Protecting Your Family from Lead in Your Home.

(e)    Purchaser has (check (i) or (ii) below):

   (i) ___ Received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

   (ii) ___ Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

## SELLING AGENT'S ACKNOWLEDGMENT (initial)

(f) __X__    Selling Agent has informed Sponsor of Sponsor's obligation under 42 U.S.C. 4852d and is aware of Selling Agent's independent responsibility to ensure compliance.

## CERTIFICATE OF ACCURACY

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

**PURCHASER(S):**

Michael A. Jackson

**SPONSOR:**

360 BROOKLYN INVESTORS, LLC
   a Delaware limited liability company

    **By:**   360 Furman Associates L.P.,
           its sole member

        By:   360 Conversion Associates LLC,
            Its general partner

            By: _____
                Name: Robert A. Levine
                Title: Manager

## RIDER TO PURCHASE AGREEMENT

### RE: CABANA

This Rider is made as of _____ July 27 _____, 2007 between Sponsor and Purchaser.

Re:  Apartment Unit No: 213  ("Unit")
One Brooklyn Bridge Park Condominium
360 Furman Street
Brooklyn, New York 11201 ("Condominium")

### 1.  THE CABANA

Upon and subject to the terms and conditions set forth herein and the Purchase Agreement to which this Rider is annexed, Sponsor agrees to sell and convey, and Purchaser agrees to purchase, the Cabana designated as Cabana No. T-6 _____ in the Declaration, together with its undivided 0.01% _____ % interest in the Common Elements appurtenant to such Cabana ("Cabana") for a Purchase Price of $ 145,000.00 _____.

The Purchase Price is payable as follows:

(a)  $ 14,500.00 _____ ("Deposit"), due upon Purchaser's signing and delivering this Agreement, by check (subject to collection), receipt of which is hereby acknowledged;

(b)  $ 130,500.00 _____ ("Balance of the Purchase Price"), by good certified check of Purchaser or official bank check, payable on the delivery of the deed.

### 2.  TEMPORARY CERTIFICATE OF OCCUPANCY

The Closing of Title to the Cabana does not require issuance of a Temporary Certificate Occupancy. Purchaser will be required to consummate the purchase of the Cabana simultaneously with the Closing of Title to the Unit. Alternatively, at Sponsor's sole discretion, the Closing of Title to the Cabana may not occur simultaneously with the Closing of Title to the Unit which may result in additional costs to be incurred by Purchaser.

### 3.  DAMAGE TO THE CABANA

If there is a fire or other casualty to the Cabana and Sponsor does not elect to repair or restore the Cabana following such fire or casualty, then this Rider shall be deemed cancelled, the Deposit shall be returned to Purchaser, with interest earned, if any, and Purchaser will only be required to consummate the Closing of the Unit and any other Ancillary Unit which is the subject of a separate Rider.

### 4.  RIDER INCORPORATED INTO PURCHASE AGREEMENT

All of the rights, obligations, terms and conditions set forth in the Purchase Agreement with respect to the Unit shall apply to the Cabana unless the context otherwise requires.

5.   **CROSS DEFAULT**

A default by Purchaser under this Rider shall constitute a default under the Purchase Agreement for the Unit and any default by Purchaser under the Purchase Agreement for the Unit shall constitute a default under this Rider entitling Sponsor to those default remedies more fully described in the Purchase Agreement and the Plan. Notwithstanding an earlier Closing of Title with respect to the Unit, the provisions of the Purchase Agreement with respect to the sale and purchase of the Cabana shall survive the Closing of Title to the Unit.

6.   **DEFINITIONS**

All capitalized terms used in this Rider not defined herein shall have the same meanings ascribed to them in the Purchase Agreement to which this Rider is annexed or in the Plan.

7.   **CONFLICTS**

In the event of any inconsistency between the provisions of this Rider and those contained in the Purchase Agreement to which this Rider is annexed, the provisions of this Rider shall govern and be binding.

8.   **FULL FORCE AND EFFECT**

Except as set forth in this Rider, all of the terms and conditions of the Purchase Agreement remain unchanged and in full force and effect.

**PURCHASER(S):**

Michael A. Jackson

_____

**SPONSOR:**

**360 BROOKLYN INVESTORS, LLC**
   a Delaware limited liability company

   By:   360 Furman Associates L.P.,
         its sole member

         By:   360 Conversion Associates LLC,
               its general partner

               By: _____
                   Name: Robert A. Levine
                   Title:  Manager

## ADDITIONAL RIDER – PURCHASER'S COMMENTS

Re:  Apartment Unit Number(s):   213
One Brooklyn Bridge Park Condominium / 360 Furman Street
Brooklyn, New York 11201 ("Condominium")

1.  Nothing contained in Paragraph 8 of the Agreement shall be deemed to required Purchaser to purchase its title insurance from the Title Company, it being the parties' intention that Purchaser shall be permitted to purchase title insurance from any title insurance company licensed to do business in the State of New York, but that the Title Company shall render the final decision on disputes regarding title matters.

2.  Notwithstanding anything to the contrary in this Agreement, if the Deposit is not collectible for any reason, Sponsor shall notify Purchaser's attorney in writing and Purchaser shall have three (3) business days from delivery of such notice to replace said check with a certified check or bank check.

3.  Notwithstanding anything in Paragraph 9.4 of the Agreement to the contrary, Purchaser shall have the right to adjourn the date of closing of title for a period not to exceed fifteen (15) days without incurring penalties are provided for in Paragraph 9.4 of the Agreement, provided that Seller is notified of such adjournment within ten (10) days prior to the scheduled closing date. If the closing is adjourned by Purchaser, then Purchaser and Seller shall fix a new date and time for closing that is within said fifteen (15) day period.

4.  Notwithstanding Paragraph 13.2 of the Agreement, Sponsor shall not be entitled to seek specific performance upon the occurrence of an Event of Default, it being the parties' intention that Sponsor's remedies for an Event of Default shall be limited to cancelling the Agreement and retaining the Deposit as liquidated damages.

5.  Paragraph 22 of the Agreement is hereby omitted and replaced with the following:

"22.   Broker

Sponsor and Purchaser represents to each other that they have not dealt with any broker in connection with this transaction other than Selling Agent and Co-Broker, if any, named in this Agreement, whose commissions shall be paid by Sponsor.  Sponsor or Purchaser, as the case may be, shall pay the commission of any broker with whom such party may have dealt, other than Selling Agent and Co-Broker.  The parties agree that, should any claim be made against either party for commissions by any broker, other than Selling Agent or Co-Broker, on account of any acts of the other party or the other party's representatives, such other party will indemnify and hold the first party free and harmless from and against any and all liabilities and expenses in connection therewith, including reasonable legal fees. The provisions of this Article shall survive the Closing of Title."

6.  Notwithstanding anything in the Agreement to the contrary, in the event that the Sponsor fails to close title to the Unit with Purchaser on or before December 31, 2008 ("Outside Closing Date"), through no fault of the Purchaser, Purchaser shall have right to terminate the Contract by delivering a rescission notice to Seller within ten (10) days after the Outside Closing Date.  If Purchaser timely elects to terminate the Contract, Seller shall return to Purchaser all sums deposited by Purchaser under the Contract, together with interest earned thereon, if any, as required by the Plan.  Upon making such payment, the Contract shall be terminated and neither party shall have any further rights, obligations or liability to or against the other under the Contract or the Plan.

7.  At closing, the appliances, if any, and all other fixtures, equipment, mechanical, plumbing and electrical building systems shall be in working order in accordance with all applicable Condominium Board and governmental requirements.  Any required smoke detectors and/or carbon monoxide detectors shall be installed and operable in accordance with all applicable Condominium Board and governmental requirements.

8.  Sponsor shall permit Purchaser and Purchaser's contractors, architect, and other authorized persons to visit and inspect the Unit from time to time, for the purpose of taking measurements, obtaining estimates and other related purposes upon reasonable prior telephone notice to Sponsor, subject to compliance with the site safety requirements of Sponsor's contractor.

9.  Purchaser shall be entitled to one (1) assignment of the Agreement without the consent of Sponsor and without paying any additional fee to Sponsor, provided that (A) said assignment is (i) to an immediate family member of Purchaser, or (ii) to a legal entity which is owned and controlled by any combination of Purchaser and/or an immediate family member of Purchaser and which the above-mentioned persons have, in the aggregate, at least a 51% beneficial interest in, and (B) said assignment shall be at no cost, liability or expense to Sponsor, provided that in such event, (I) written notice of such assignment is given to Sponsor's counsel on or before fifteen (15) days prior to closing, and (II) Purchaser shall pay the legal fee to Sponsor's counsel of $1,250.00 for processing such assignment, as set forth in the Plan.

10. To Sponsor's knowledge, there is no litigation pending or threatened against Sponsor or the property which could materially and adversely affect Sponsor's ability to consummate the sale of the Unit as contemplated by this Agreement.

11. A copy of any notice sent to Purchaser by Sponsor or Sponsor's attorney hereunder shall simultaneously be sent to Purchaser's attorney, Seth S. Weitz, Esq., 747 Third Avenue, New York, NY 10017.

12. All capitalized terms used in this Rider not defined herein shall have the same meanings ascribed to them in the Purchase Agreement to which this Rider is annexed or in the Plan.

13. In the event of any inconsistency between the provisions of this Rider and those contained in the Purchase Agreement to which this Rider is annexed or the Plan, the provisions of this Rider shall govern and be binding.

14. Except as set forth in this Rider, all of the terms and conditions of the Purchase Agreement remain unchanged and in full force and effect.

15.   This Rider may be executed in any number of counterparts. Each such counterpart shall for all purposes be deemed an original. All such counterparts shall together constitute but one and the same Rider.

This Rider is hereby executed as of the date set forth in the Agreement to which this Rider is attached.

**PURCHASER(S):**

MICHAEL A. JACKSON

**SPONSOR:**

360 BROOKLYN INVESTORS, LLC
    a Delaware limited liability company

    By:   360 Furman Associates L.P.,
         its sole member

        By:   360 Conversion Associates LLC,
            its general partner

           By: _____
               Name: Robert A. Levine
               Title:  Manager

**SETH S. WEITZ**
*Attorney at Law*
**747 Third Avenue**
**New York, New York 10017**

---

**Telephone (212) 980-9595**
**Telecopier (212) 980-0729**

March 20, 2009

**BY HAND DELIVERY and E-MAIL**
Lampiasi & Associates LLP
86 Chambers Street
Suite 704
New York, NY 10007
Att: Jeffrey Lampiasi, Esq.

**Re:    NOTICE OF RESCISSION of Contract between 360 Brooklyn Investors, LLC and Michael A. Jackson for Unit No. 213 and Cabana T-6 at One Brooklyn Bridge Park Condominium, Pursuant to 15 U.S.C. § 1703(c)**

Dear Mr. Lampiasi:

As you are aware, this firm has been retained as litigation counsel for Michael A. Jackson, in connection with the above-referenced transaction. We understand that 360 Brooklyn Bridge Investors, LLC, did not meet the requirements of the Interstate Land Sales Full Disclosure Act (hereinafter "ILSA"), 15 U.S.C. § 1701, *et seq.* because, *inter alia*, it failed to register the project and it failed to provide my clients with a property report prior to the execution of the purchase agreement. As a result, my client, in addition to other rights of rescission he has under the Contract, is exercising his option pursuant to §1703(c) of ILSA to rescind, revoke and terminate the purchase agreement and demand return of his money deposit.

Please forward my client's refund to me by way of check payable to this law firm's trust account. If the refund is not received by March 27, 2009, my client has instructed me to take further legal action, including but not limited to, the filing of a complaint with the Department of Housing and Urban Development ("HUD") and/or commencing an action in Federal Court, seeking in addition to the foregoing refund, all other remedies afforded under ILSA. Should you wish to discuss the matter further with me prior to the foregoing date, please contact me at your convenience.

## LAW OFFICE OF SETH S. WEITZ
### 747 Third Avenue
### New York, New York 10017

**Telephone** (212) 980-9595
**Telecopier** (212) 980-0729

## RESCISSION NOTICE

January 5, 2009

### BY FEDERAL EXPRESS AND HAND DELIVERY

Lampiasi & Associates LLP
Attn: Jeffrey Lampiasi, Esq.
86 Chambers Street, Suite 704
New York, NY 10007

> Re:     **360 Brooklyn Investors, LLC to Michael A. Jackson**
> Premises: **One Brooklyn Bridge Park Condominium, 360 Furman Street, Unit 213/
> Cabana No. T-6, Brooklyn, New York**

Dear Sir:

I am the attorney for the above purchaser, Michael A. Jackson ("Purchaser"), and this notice is being sent to the Sponsor/Seller, 360 Brooklyn Investors, LLC, ("Sponsor" or "Seller") c/o your office, on behalf of the Purchaser, pursuant to Paragraph 25 of the Purchase Agreement between the Purchaser and Sponsor dated July 27, 2007, (the "Purchase Agreement"). Reference is made to the Purchase Agreement and specifically to Paragraph 16 of the "Additional Rider-Purchaser's Comments", which provides in pertinent part as follows:

"...in the event that the Sponsor fails to close title to the Unit with Purchaser on or before December 31, 2008 ("Outside Closing Date") through no fault of the Purchaser, Purchaser shall have right to terminate the Contract by delivering a rescission notice to Seller within ten (10) days after the Outside Closing Date."

Please be advised that Purchaser hereby terminates the Purchase Agreement due to Sponsor's failure to close by December 31, 2008. Please return the Deposit, together with accrued interest immediately to me.

Very truly yours,

Seth S. Weitz

cc: 360 Brooklyn Investors, LLC
    c/o 86 Chambers Street
    Suite 704
    New York, NY 10007
    (By Regular Mail and Federal Express)
    Michael A. Jackson (By E-mail)

SSW:acm